2009 Ark. App. 574

Donna HANNA, as Next Friend of Brooke Gabrielle Hanna and Jake Mason Hanna, Appellant,

v.

Burt HANNA, Individually and as Trustee of the Brooke Gabrielle Hanna Trust and the Jake Mason Hanna Trust, Appellee.

No. CA 08–1256.

Court of Appeals of Arkansas.

Sept. 9, 2009.

Rehearing Denied Oct. 28, 2009.

Wright, Berry, Hughes and Moore, by: Rodney P. Moore, Arkadelphia, AR, for appellant.

Taylor Law Partners, LLP, by: William B. Putman, Fayetteville, AR, for appellee.

RITA W. GRUBER, Judge.

Appellant Donna Hanna, acting as her children's next friend, sued the children's father, appellee Burt Hanna, for self-dealing, breach of fiduciary duty, and mismanagement of assets in connection with the children's trusts. The Washington County Circuit Court awarded Donna limited relief but generally upheld Burt's actions as being in the trusts' best interests. Donna appeals and argues that the court clearly erred in its ruling. We disagree and affirm.

Donna and Burt are now divorced, but during their marriage they founded the Hanna Candle Company, a very successful candle and scent manufacturing operation in Fayetteville. They also formed several other companies, primarily for the purpose of buying and developing real estate. One of Burt and Donna's companies, JB Hanna, LLC (JBH), owned the manufacturing plant that housed Hanna Candle Company.

|2In 1999, Burt and Donna created trusts for their two children, Brooke and Jake. The trusts designated Burt and Donna as co-trustees and were funded with a modest initial grant of $500 each. Later, Burt and Donna transferred ninety-eight percent of JBH to the trusts, retaining a two-percent interest for themselves. The rent that JBH received from Hanna Candle, variably $150,000 to $190,000 per month, became the primary source of the trusts' income.

In 2004, Donna sued Burt for divorce. Their July 2005 property-settlement agreement gave Burt all of the stock in Hanna Candle, along with Donna's one-percent interest in JBH and sole trusteeship of the children's trusts. Donna's settlement was $16 million in cash, with an immediate installment of $1 million, to be followed by the remaining $15 million over the next sixty days. Burt asked Hanna Candle's Chief Financial Officer, John Scott, to formulate a plan to acquire the $15 million. Scott deduced that most of the property owned by Hanna Candle or by Burt's other companies was encumbered and therefore could not be used as collateral to secure a loan. However, he determined that the property owned by

JBH was basically unencumbered. Based on Scott's recommendation, Burt decided to obtain loans for the $15 million by pledging JBH properties as collateral. His plan involved at least two banks and several complicated transactions, including a restructuring of Burt's personal line of credit and Hanna Candle's existing line of credit. Ultimately, several tracts of JBH realty were collateralized to secure over $30 million. Included in that amount was a $3 million loan to three Hanna Candle officers, who paid the money to Burt in exchange for Hanna Candle stock. As a result of these financial dealings, Burt successfully obtained the $15 million and paid Donna within sixty days.

According to Donna, she was initially unaware that Burt had encumbered JBH assets. But, on July 25, 2006, acting as her children's next friend, she sued Burt for an accounting, for breach of fiduciary duty, for damages, and to remove him as trustee. Her complaint and her subsequent arguments to the court cited not only the above mentioned loan transactions but alleged, *inter alia*, that Burt had reduced the rent on the Hanna Candle plant, which was payable to JBH, from $190,000 to $150,000 per month; that Burt owed approximately $830,000 on a personal debt to JBH; that one of Burt's companies occupied certain JBH property rent-free; that another company had purchased JBH property at below fair-market value; and that certain JBH property was actually leased to the tenant by Hanna Candle.

During a three-day bench trial in December 2007, Donna offered testimony that the trusts' taxable income had decreased since 2005 and that Burt could have financed the $16 million divorce settlement by means other than using the JBH assets. However, Burt testified that he had done well by his children, that he intended to grow their trusts to $100 million, and that he planned to reduce the JBH debt as quickly as possible. Burt further said that, in pledging JBH's assets, he did not know that he was doing anything wrong and that he had the best intentions. Scott testified that JBH's equity had increased from approximately $23 million in 2005 to approximately $29 million in 2007. Scott also noted that, since the divorce settlement, Hanna Candle had signed a ten-year lease of the property owned by JBH for $150,000 per month. CPA David Hogan stated that JBH had suffered no actual economic loss as a result of its assets being pledged. Additionally, Burt and Scott testified that the property–settlement agreement—which gave Burt sole control of Hanna Candle—and the loan transactions that financed the agreement, were necessary to preserve Hanna Candle and, consequently, to preserve JBH and the trusts. Burt asserted that, if he had not retained ownership of Hanna Candle, the business would have failed and could not have paid rent to JBH. In short, Burt presented evidence that it was to JBH's advantage that he make the divorce settlement, which he could only accomplish by pledging JBH assets. Arvest Bank officer Craig Shy likewise testified that the bank could not have funded Burt's loan without using JBH assets as collateral.

In addition to the above evidence, Burt introduced an opinion from expert witness Jack Butt. Mr. Butt, an attorney, stated that Burt had engaged in self-dealing as a trustee but that the self-dealing was justified under the circumstances. Butt stated that Burt acted reasonably and prudently and that the preservation of Hanna Candle under "singular control" after the divorce was essential to preserving the value of JBH and likewise the trusts.

On June 11, 2008, the circuit court entered an order finding that Burt's actions were legally justified "as a result of the exceptional circumstances that existed."

The court ruled that Burt acted "reasonably and prudently" in the loan transactions and that "the continued success of [JBH] was tied to [Hanna Candle's] continued ability" to occupy the building owned by JBH. The court noted that Burt's actions actually benefited the trusts because his actions "stabilized and insured an income stream of $150,000 per month for a ten-year period to the ⌊₅Trusts...."[1] Accordingly, the court refused to remove Burt as trustee and refused to award damages to the trusts or dismantle the loan transactions. However, the court did order Burt to remove JBH assets as collateral for the three officers' loans totaling $3 million. The court also appointed the Bank of Oklahoma as co-trustee for the trusts; declined to order a formal accounting but found that Donna was entitled to information from Burt on request; and ordered Burt and the Bank of Oklahoma to address Burt's repayment of $830,000 that he owed JBH. Finally, the court found that certain other dealings between JBH and Burt's companies did not evidence any misconduct by Burt. Donna appeals from that order. For reversal, she contends that Burt's actions were contrary to the terms of the trusts and Arkansas law and that the circuit court clearly erred in finding that Burt acted in the trusts' best interests. She also contends that the circuit court failed to offer her a "meaningful remedy" for Burt's violations.

■ The construction, interpretation, and operation of trusts are matters within the traditional jurisdiction of the courts of equity. *See Sutter v. Sutter,* 345 Ark. 12, 43 S.W.3d 736 (2001). We review traditional equity cases de novo and will not reverse a finding of fact by the trial court unless it is clearly erroneous. *Sanford v. Sanford,* 355 Ark. 274, 137 S.W.3d 391

(2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*

⌊₆Donna argues that Burt's actions were strictly prohibited by Arkansas law and by the terms of the trusts and that, consequently, the circuit court should have gone further in awarding relief to the trusts. She points out that both of the trust instruments prohibit a grantor's using the trusts' principal or income for his benefit and that Arkansas common law recognizes a universal rule of equity that a trustee must not deal with the trust property to his own advantage without knowledge or consent of the *cestui que trust.* *See, e.g., Hosey v. Burgess,* 319 Ark. 183, 890 S.W.2d 262 (1995). The circuit court agreed with Donna to an extent by appointing a co-trustee, by arranging for Burt to repay a personal loan, and by removing JBH assets as collateral from that portion of the loans that benefited Hanna Candle officers. However, the court generally determined that Burt's actions were in the best interests of the trusts under the "exceptional circumstances" presented.

■ We agree that this case presents a special situation. The economic fates of Burt, Hanna Candle, JBH, and the trusts were inextricably intertwined. The divorce proceedings threatened the economic viability of all of these entities and, given their symbiotic nature, any action taken by Burt to effectuate a divorce settlement to protect his interest in Hanna Candle inevitably protected them all. This was not, therefore, simply a case of a trustee utilizing trust assets solely to pay for his di-

1. The prior, three-year lease for $190,000 per month had expired before the divorce settlement. Hanna Candle was occupying the JBH property without a lease until Burt executed the ten-year lease for $150,000 per month on July 1, 2005.

vorce settlement, nor a case in which the trustee's actions failed to benefit the trusts. *E.g., Carmichael v. Sec. Sav. & Loan Ass'n,* 264 Ark. 657, 574 S.W.2d 651 (1979); *Hardy v. Hardy,* 222 Ark. 932, 263 S.W.2d 690 (1954). As expert witness Jack Butt observed, it was incumbent upon Burt to maintain his control over Hanna Candle and to preserve its financial health in order to preserve the trusts, considering that Hanna Candle was the trusts' primary source of funding. Butt also stated that Burt faced a critical situation at the time Donna filed for divorce in that he could neither continue to operate Hanna Candle with Donna nor allow a court-ordered sale or liquidation of the company without the company losing its value. His prudent alternative, Butt said, was to execute the divorce settlement and pay Donna $16 million, which would allow him to maintain Hanna Candle under his sole control and thus maintain the asset that drove the trusts' wealth. According to several witnesses, the only means by which Burt could accomplish this was to collateralize the JBH assets for the purpose of obtaining loans to secure the $15 million balance that was due on the divorce settlement.

Under these circumstances, we conclude that the circuit court used its equitable powers to fashion a decision within the parameters of the law. *See generally Clement v. Larkey,* 314 Ark. 489, 863 S.W.2d 580 (1993) (considering the full circumstances of a case to determine whether a trustee breached her duty of loyalty); *see also* George G. Bogert, *The Law of Trusts & Trustees* § 543, at 248 (2d rev. ed.1993) (recognizing a trend for courts to consider all the facts and circumstances of

a case before determining whether a trustee has breached his duty of loyalty). The court understandably considered the unique nature of the situation at hand and looked beyond the surface of Burt's conduct to determine that his actions were for the benefit of the trusts. Moreover, in light of the testimony at trial that Burt acted responsibly and to the trusts' advantage, we are not left with the definite and firm conviction that a mistake has been committed. We therefore do not deem the circuit court's findings clearly erroneous. We emphasize that our ruling is confined to the particular circumstances of this case and should not be read to permit a trustee to encumber trust property in the absence of extraordinary circumstances.[2]

Additionally, Donna claims that other actions by Burt called his loyalty to the trusts into question. She points out that, in 2005, Burt reduced the rent payable by Hanna Candle to JBH from $190,000 per month under a three-year lease to $150,000 per month. However, the circuit court noted that the $150,000 amount was payable under a ten-year lease, rather than a three-year lease, and that the property's appraisal supported a rental value of approximately $150,000 per month. Donna also claims that one of Burt's companies purchased JBH realty for less than fair-market value. However, this was contradicted by testimony that the purchase price actually exceeded fair market value. As for Donna's contention that one of Burt's companies occupied certain JBH property rent-free, the evidence showed that this was simply a continuation of a practice that began when Donna and Burt owned the company together, prior to the

---

**2.** Donna also argues that Burt's actions violated part of the Arkansas Trust Code. *See* Ark.Code Ann. § 28–73–802(a) (Supp.2009). However, at trial, Donna strongly indicated to the court that the Trust Code was not applicable. She has therefore changed her argument on appeal, which is prohibited. *Dugal Log-*

*ging, Inc. v. Ark. Pulpwood Co.,* 66 Ark.App. 22, 988 S.W.2d 25 (1999). In any event, the Trust Code does not govern actions taken before September 2005, as were the majority of Burt's actions of which Donna complains herein. Ark.Code Ann. § 28–73–1106(a)(5).

divorce. And, regarding Donna's argument that certain JBH property was actually leased to a tenant by Hanna Candle, the court found that the lease agreement was with JBH and that the reduced rental payments by the tenant were reasonable in light of the repairs needed on the property. Given the evidence at trial we see no clear error in these rulings.

For these reasons, we affirm the circuit court's order.

Affirmed.

ROBBINS and BROWN, JJ., agree.